UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


| | | |
|---|---|---|
| **MARTY LEE McKAY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:14-cv-1296** |
| | ) | **Judge Thomas A. Wiseman, Jr.** |
| **SOCIAL SECURITY** | ) | |
| **ADMINISTRATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |


## MEMORANDUM OPINION

Pending before the court is the plaintiff Marty Lee McKay's Motion for Judgment on the

Administrative Record (ECF No. 15), to which the defendant Social Security Administration

(SSA) has responded (ECF No. 17). The plaintiff did not file a reply to the SSA's response.

Upon consideration of the parties' briefs and the transcript of the administrative record (ECF No.

10),[1] and for the reasons given below, the plaintiff's Motion for Judgment on the Administrative

Record will be DENIED and the decision of the SSA will be AFFIRMED.

### I. Magistrate Judge Referral

To avoid any further delay in the resolution of this matter, the court will VACATE the

referral to the magistrate judge.

---

[1] Referenced hereinafter by "Tr." followed by a page number which can be found at the lower right corner
of the transcript.

## II. Introduction

The plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act and an application for supplemental security income ("SSI") under Title XVI of the Social Security Act[2] on August 19, 2010,[3] (Tr. 17, 44), alleging disability onset as of June 30, 2010, (Tr. 149), due to three bulging discs in his back, nerve damage in his neck and Type 2 diabetes. (Tr. 152.) The SSA initially denied his claim to benefits on April 12, 2011, and upon reconsideration on July 26, 2011. The plaintiff subsequently requested *de novo* review of his case by an Administrative Law Judge (ALJ). The ALJ heard the case on November 27, 2012, when the plaintiff appeared with counsel and gave testimony. (Tr. 37–70.) Testimony was also received from an impartial vocational expert. (*Id.*) At the conclusion of the hearing, the matter was taken under advisement until January 16, 2013, when the ALJ issued a written decision finding that the plaintiff was not disabled. (Tr. 17–28.) That decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2. The claimant has not engaged in substantial gainful activity since June 30, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

---

[2] The Act and implementing regulations regarding Disability Insurance Benefits (contained in Title II of the Act and 20 C.F.R. Part 404 of the regulations) and SSI (contained in Title XVI of the Act and 20 C.F.R. Part 416 of the regulations) are, substantially identical. *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003) (noting that the Title II and the Title XVI definition of "disability" is "verbatim the same" and explaining that "[f]or simplicity sake, we will refer only to the II provisions, but our analysis applies equally to Title XVI.") The Court cites to both sets of regulations interchangeably throughout this opinion.

[3] The parties note different application filing dates with the plaintiff claiming August 19, 2010 and the defendant claiming August 30, 2010 as the protective filing date. At the hearing the ALJ noted that her records showed a filing date of August 19, 2010, (Tr. 44), which was also the date she used in her decision (Tr. 17). Therefore, for purposes of this decision, the court will assume that August 19, 2010 is the correct filing date.

3. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine; learning disorder; major depressive disorder; panic disorder; obesity; diabetes mellitus; chronic obstructive pulmonary disorder; hypertension; obstructive sleep apnea with use of a CPAP machine; and right leg edema (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). The claimant can lift and carry twenty pounds occasionally and ten pounds frequently. The claimant can sit, stand, or walk for six hours total each. The claimant can never climb ladders ropes or scaffolding; can occasionally stoop and crawl and can frequently perform all other postural activities. The claimant should not be exposed to hazards in the workplace. He is also limited to unskilled work consisting of simple tasks and instructions; and work that requires no more than occasional changes in the workplace routine and can perform no work that requires reading or writing.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on August 7, 1975 and was 34 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled," whether or not the claimant has transferable job skills (See SSR 82-41and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the regional and national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 30, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 19-20, 22, 26-28.)

On April 15, 2014, the Appeals Council denied the plaintiff's request for review of the ALJ's decision (Tr. 1–5), thereby rendering that decision the final decision of the SSA. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. § 405(g). If the ALJ's findings are supported by substantial evidence based on the record as a whole, then those findings are conclusive. *Id.*

### III. Review of the Record

The following summary of the medical record is taken from the ALJ's decision:

The claimant alleges disability due to limitations from pain and mental impairment. He alleges pain and limitation from bulging discs in his neck, nerve damage in his neck, high blood pressure, fluid retention, diabetes and blurred vision (Exhibit 8F). He alleges that he is limited in his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, remember and understand (Exhibit 5E). He alleges that he cannot read or write and that he was in special education classes from the first grade though the ninth (id.).

After careful consideration of all of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

The claimant admits that his daily activities include caring for his kids and wife; driving; paying bills and counting change. He admits that his leisure activities include going to the lake and grilling. Recently, he told his physician that he walks weekly for exercise (Exhibits 5E and 6F). The undersigned finds that the claimant's activities of daily living are not as limited as one would expect given the allegations of disabling pain and limitation.

The record shows that, since 2005, the claimant has had symptoms from musculoskeletal impairments, diabetes, hypertension, disc bulge, edema and anxiety (Exhibit 2F). He reports that he has never been able to read or write. However, the claimant worked with these impairments for several years (Exhibit 4E). The fact that these impairments did not prevent the claimant from working

4

in the past suggests that they would not currently prevent him from working. Additionally, the claimant reported to the psychological consultative examiner that he left his work the year before because of company downsizing. This admission suggests that the claimant's current unemployment is not related to his medical impairments.

Magnetic resonance imaging in 2005 showed diffuse disc bulge with left foraminal disc protrusion at L4-5 resulting in moderate left foraminal narrowing and displacement of the L4 nerve root, mild disc bulge and mild facet arthropathy at L5-S 1 without evidence of associated stenosis and mild facet degeneration at L3-4 (Exhibit 2F/68). Then, in June 2010, the claimant fell and suffered a compression fracture of the lumbar spine (Exhibit 5F/7). X-rays at that time showed a mild wedge compression fracture of Ll (id.).

With regard to the claimant's limitations related to musculoskeletal pain, the record does not support the level of limitation alleged. During a physical examination in October 2006, the claimant weighed 383 lbs, was 70 inches, his blood pressure was 125/82, and he was well-developed, morbidly obese in no acute distress. His gait was not ataxic or antalgic, he had a full range of motion of the cervical and lumbar spine in all planes. There was diffuse tenderness on palpation throughout the lumbar paraspinal muscles and over the cervical spine in the midline. The claimant's pain response was noted to be exaggerated. In June 2010, about the time of the alleged onset date, the claimant reported that his pain was the same (Exhibit 4F/4). At the time of his fall in 2010, the claimant's range of motion in his neck and back was within normal limits and he had no trouble walking (Exhibit 5F/8, 9). The claimant admitted to Dr. Lambert that, if necessary, he can perform heavy lifting (Exhibit 8F/4).

With regard to the alleged limitations from back and neck pain, the medical record does not support disabling limitations from pain. In terms of treatment, the claimant's pain management records indicate that his treatment for pain included injections, physical therapy and pain medications (Exhibit 21F). His medications include Lortab, Percocet and Zanaflex (Exhibit 21F/5). His provider reported that the claimant's pain was adequately controlled and the various treatments had improved the claimant's activity level (Exhibit 21F/4). Treatment records from the claimant's pain management provider indicate that his treatment worked in controlling his pain (Exhibit 16F). He reported that, with treatment, his pain levels averaged two out of ten eighty percent of the time (Exhibit 16F/1). The claimant's recent medications include transcutaneous electrical nerve stimulation (TENS), Lortab, Soma, Lodine, Lexapro, Lortel, Xanax, Lasix, and citalopram hydro Bromide (Exhibit 16F/4). In May 2012, Damita Bryant, M.D., the claimant's treatment provider, stated that the claimant's urine drug screen contained low hydrocodone levels, with no metabolite and tested positive for oxycodone and oxymorphone, which he was not prescribed (Exhibit 18F). The claimant admitted that his pain medications and TENS unit were effective in reducing his pain. He also reported that there were no drug side effects including

5

respiratory depression, gastrointestinal irritation, constipation, rash, or excessive day time drowsiness (Exhibit 18F). The most recent records from the pain clinic, on September 26, 2012, show that the claimant admitted to his treatment provider that his pain was controlled (Exhibit 21F/3, 22).

With regard to joint pain in his knee and wrist, radiographic results showed no abnormality in the right wrist or right knee (Exhibit 9F/5). Physical activities consist of walking. The undersigned finds that the claimants limitations related to musculoskeletal impairments and pain are adequately addressed in the residual functional capacity statement above.

In April 2010, prior to the alleged onset date, the claimant had pneumonia (Exhibit 5F). He was diagnosed with chronic obstructive pulmonary disease (Exhibit 3F). The undersigned notes that the claimant's pulmonary function test and spirometry did not indicate significant abnormalities (Exhibit 9F). The exertional limitations, as described above, in the residual functional capacity adequately address the claimant's pulmonary limitations.

The claimant's diagnoses include diabetes, hypertension (Exhibit 19F). In June 2011, the claimant reported that he had not been taking medication to control his diabetes because he lost his insurance (Exhibit 17F/7). At that time, he was put on Metformin, Lisinopril, and Lovastatin (Exhibit 17F/9). The claimant has had skin infections on multiple occasions; however, they have responded to treatment. The claimant had cellulitis in his right leg (Exhibit 19F/4). The claimant had a boil on his thigh that was drained and a boil on his stomach that required treatment (Exhibits 15F and 17F). The undersigned finds that the claimant's limitations related to obesity, diabetes and hypertension are adequately addressed with limitations in bending, stooping and climbing.

With regard to the claimant's mental limitation, the record does not support limitations of the degree alleged. The claimant attended a psychological consultative examination in March 2011 with Dorothy Lambert, Ph.D. (Exhibit 8F). The claimant endorsed symptoms of feeling depressed and sad; feeling tense, nervous, and jumpy; worrying a lot; feeling frightened sometimes; having panic attacks when he is nervous or angry where he has trouble breathing, shaking, feeling overheated, and problem where everything blacks out except for the person with whom he is mad. He reports that his heart races and his chest hurts; he has crying spells sometimes; he has difficulty falling asleep; he reported waking in the middle of the night and being unable to go back to sleep. He reported difficulty concentrating sometimes; feeling useless; feeling grouchy and irritable and sometimes snapping at people; and being unable to enjoy things as much as he had formerly. He said his depression has worsened for the past couple of years when there were multiple deaths in his family and he lost his job (Exhibit 8F). Based on the claimant's symptom report, the mental examiner indicated that the claimant's diagnoses included major depressive disorder, moderate, recurrent; panic disorder with possible agoraphobia; rule out disruptive behavior disorder,

not otherwise specified, per history; and mild mental retardation (Exhibit 8F/6). The GAF score is a clinician's rating, of an individual's overall psychological, social and occupational functioning, on a scale of 0 to 100. A rating of 55 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. (See, American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision pg. 34, 2000). The claimant's GAF score was 55 (id.). In addition to the GAF assigned indicating only moderate limitations, several other factors that considered in forming the GAF, which do not affect the claimant's ability to perform work activities: his children's fussy behavior, his recent divorce and reunification with his wife, and his stepdaughter's skin rash (id.).

With regard to the claimant's diagnosis of mild mental retardation, the claimant's test results and school records support some of his allegations, but not to the extent alleged. The claimant's school records show that he was diagnosed with a learning disorder and received special assistance in resource classes (Exhibit 9E). On intellectual examination with Dr. Lambert, the claimant's Full Scale IQ was 61 (Exhibit 8F). These indicate limitations related to intellectual functioning; however, after he left school, the claimant has been employed as a welder, tow motor driver, and an armed security guard. The claimant also admitted that he was able to obtain certification in order to carry a firearm for his job, which suggests that he was able to complete the necessary paperwork and any testing required. The claimant's work history is inconsistent with diagnosis of mild mental retardation and shows the ability to perform more complex work. Giving the claimant the benefit of the doubt, the undersigned finds that the claimant is limited to unskilled work consisting of simple tasks and instructions; and work that requires no more than occasional changes in the workplace and, giving the claimant the benefit of the doubt as to his abilities- no work that requires reading or writing.

As for the opinion evidence, the undersigned gives great weight to the assessment from Victor O'Bryan, Ph.D. (Exhibit 11 F). Dr. O'Bryan opined that the claimant has moderate limitations in concentration, persistence and pace (id.). Dr. O'Bryan specified in April 2011 that the claimant can perform one to three step tasks; can maintain concentration, persistence and pace for two hour periods during the workday; can interact appropriately in the workplace; and can adapt to infrequent changes in work routine (Exhibit 12F). The undersigned gives great weight to Dr. O'Bryan's opinions and finds that the mental residual functional capacity as stated above is consistent with Dr. O'Bryan's opinions.

The undersigned gives great weight to the assessment from Marvin Bittinger, M.D. in March 2011 (Exhibit 10F). Dr. Bittinger opined that the claimant can lift and carry twenty pounds occasionally and ten pounds frequently. The claimant can sit, stand, or walk six hours in an eight-hour workday. The claimant can never climb ladders, ropes or scaffolds, can perform occasional stooping or crawling and frequent crouching, kneeling, balancing and climbing stairs. The

claimant should avoid concentrated exposure to hazards, including unprotected heights (Exhibit 10F). The undersigned finds that this opinion is consistent with the objective evidence and the claimant's admitted abilities and activities. The record does not contain any opinions from treating or examining physicians indicating that the claimant is disabled or even has limitations greater than those determined in this decision.

The undersigned assigns little weight to Bruce Davis, M.D., the consultative examiner (Exhibit 6F). Dr. Davis's opinion, from January 2011, is mostly consistent with the residual functional capacity assessed in this decision; however, he assessed limitations related to reaching, handling and fingering and decreased ability to perform walking and standing (Exhibit 6F/5). The undersigned can find no documentation to support a reduction to occasional use of both hands.

The undersigned gives greater weight to the opinion of Dr. Bittinger who was able to consider Dr. Davis's examination notes and assessment but indicated that the claimant was able to perform up to six hours of walking or standing in an eight-hour workday.

The undersigned gives little weight to the psychological examiner, Dorothy Lambert, Ph.D., who indicated that the claimant has marked impairments in understanding and remembering short work-like procedures (Exhibit 8F). The undersigned has considered Dr. Lambert's diagnoses and examination as discussed above; however, the marked rating appears to overstate the claimant's limitations since the claimant has done detailed work in the past. Also, the claimant was able to obtain necessary certification for carrying a firearm and he worked as a welder, which was classified as a skilled job.

(Tr. 23–26.)

## V. Conclusions of Law

### A. Standard of Review

This court reviews the final decision of the SSA to determine whether substantial evidence supports that agency's findings and whether it applied the correct legal standards. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016). Substantial evidence means "'more than a mere scintilla' but less than a preponderance; substantial evidence is such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). In determining whether substantial evidence supports the agency's findings, a court must examine the record as a whole, "tak[ing]

into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)). The agency's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion. *See Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 473 (6th Cir. 2016) (citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Accordingly, this court may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). Where, however, an ALJ fails to follow agency rules and regulations, the decision lacks the support of substantial evidence, "even where the conclusion of the ALJ may be justified based upon the record." *Miller*, 811 F.3d at 833 (quoting *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014)).

### B. The Five-Step Inquiry

The claimant bears the ultimate burden of establishing an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). The SSA considers a claimant's case under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2) A claimant who does not have a severe impairment will not be found to be disabled.

3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4) A claimant who can perform work that he has done in the past will not be found to be disabled.

5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

*Parks v. Soc. Sec. Admin.*, 413 F. App'x 856, 862 (6th Cir. 2011) (citing *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007)); 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden through step four of proving the existence and severity of the limitations his impairments cause and the fact that he cannot perform past relevant work; however, at step five, "the burden shifts to the Commissioner to 'identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity . . . ." *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 628 (6th Cir. 2016) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).

The SSA can carry its burden at the fifth step of the evaluation process by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional impairment does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. *See Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010); *Wright v. Massanari*, 321 F.3d 611, 615–16 (6th Cir. 2003). Otherwise, the grids only function as a guide to the disability

determination. *Wright*, 321 F.3d at 615–16; *see also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert testimony. *Anderson*, 406 F. App'x at 35; *see Wright*, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)).

When determining a claimant's residual functional capacity (RFC) at steps four and five, the SSA must consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. §§ 423(d)(2)(B), (5)(B); *Glenn v. Comm'r of Soc. Sec.*, 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)).

### C. The Plaintiff's Statement of Errors

The plaintiff first argues that the ALJ's RFC determination is not supported by substantial evidence. Specifically, the plaintiff alleges that the ALJ failed to give the opinions of Drs. Davis, who conducted a consultative physical examination, and Lambert, who conducted a consultative psychological examination, greater weight than she did the opinions of non-examining Drs. Bittinger, who conducted a physical RFC assessment, and O'Bryan, who conducted a mental RFC assessment and prepared a Psychiatric Review Technique form. The plaintiff argues that because Drs. Davis and Lambert examined the plaintiff, while Drs. Bittinger and O'Bryan did not, the opinions of Drs. Davis and Lambert were entitled to greater weight.

Social security regulations and rulings establish the framework for the ALJ's consideration of medical opinions. *See* 20 C.F.R. §§ 404.1527, 416.927; SSR 96-2p. Acceptable

medical sources[4] are divided into three categories: treating sources, examining but non-treating sources; and non-examining sources. *Id.* A treating source "means your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation" consistent with accepted medical practice, and "who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1527. An examining, but "nontreating source . . . has examined the claimant but does not have, or did not have, an ongoing treatment relationship with h[im]." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007) (internal citation and quotation marks omitted). A "nonexamining source is a physician, psychologist, or other acceptable medical source who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case." *Id.* (internal citation and quotations marks omitted).

> When evaluating medical opinions, the SSA will generally give more weight to the opinion of a source who has examined [the claimant] than to the opinion of a source who has not examined h[im]. The SSA will give the most weight to opinions from [the claimant's] treating sources, since these sources are likely to be medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s). . . .

*Id.* (internal citations and quotations marks omitted). However, the SSA is only required to "give good reasons in [its] notice of determination or decision for the weight [it gives the claimant's] treating source's opinion." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010) (internal citation omitted). However, the Sixth Circuit has long held that the that "the regulation requiring an ALJ to provide 'good reasons' for the weight given a treating physician's opinion does not apply to an ALJ's failure to explain his favoring of one non-treating source's opinion over another." *Wright v. Colvin*, No. 1:15-cv-01931, 2016 WL 5661595, at *9 (N.D. Ohio Sept.

---

[4]"Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. 20 C.F.R. § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. 20 C.F.R. § 404.1513(d).

30, 2016) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506-07 (6th Cir. 2006).
Likewise, the ALJ is "under no special obligation" to provide great detail as to why the opinions
of the nonexamining providers "were more consistent with the overall record" than the
examining, but nontreating providers. *Norris Comm'r of Soc. Sec.*, 461 F.App'x 433, 440 (6th
Cir. 2012). As long as "the ALJ's decision adequately explains and justifies its determination as
a whole, it satisfies the necessary requirements. . . ." *Id.*

The ALJ amply explained why she accorded the opinions of nonexamining sources, Drs.
O'Bryan and Bittinger, greater weight than the opinions of examining, but nontreating sources,
Drs. Davis and Lambert. Initially it bears noting that Drs. Davis and Lambert met with the
plaintiff only one time at the behest of the SSA for the purpose of performing a consultative
examination, neither Dr. Davis nor Dr. Lambert treated the plaintiff.

As noted above, although the ALJ found that it was mostly consistent with her RFC
assessment, she gave little weight to Dr. Davis' opinion from January, 2011, because, Dr. Davis
"assessed limitation related to reaching, handling and fingering and decreased ability to perform
walking and standing."[5] (Tr. 25.) The ALJ found "no documentation to support a reduction to
occasional use of both hands." (*Id.*) Moreover, the ALJ concluded that the RFC assessment
providing that the plaintiff remained capable of walking or standing for 6 hours out of an 8 hour
workday, as determined by Dr. Bittinger, was "consistent with the objective evidence and the
claimant's admitted abilities and activities." (Tr. 25.)

To be sure, in his consultative examination report dated January 13, 2011, Dr. Davis
noted that the plaintiff underwent bilateral carpal tunnel release in 2000, with mild numbness and
reduced grip. (Tr. 425.) However, Dr. Davis also noted that the source of the information was

---

[5] Dr. Davis opined that the plaintiff could stand or walk for 4 hours in an 8 hour workday. (Tr. 429.)

13

"patient, NO medical reports." (*Id.* emphasis in original.) In connection with his own examination of the plaintiff, Dr. Davis noted "healed bilateral wrist surgery scars with normal wrist & finger motions (no tenderness, swelling, numbness)." (Tr. 426.) While Dr. Davis observed that the plaintiff had "reduced grip 3-4/5" (*id.*), there was ample evidence in the record to demonstrate that the plaintiff did not have on-going problems with his grip strength. For example, on February 7, 2012, during a visit at the Center for Spine, Joint and Neuromuscular Rehabilitation ("CSJNR"), the plaintiff denied "joint swelling, muscle cramps, muscle weakness, stiffness [or] arthritis." (Tr. 494.) On August 29, 2012, during a visit with T. Scott Baker, M.D. of the Tennessee Physical Medicine and Pain Management ("TPMPM") clinic, the plaintiff denied "joint swelling, limitation of motion, muscle cramps, painful joints, [and] stiffness." (Tr. 579.) Moreover, upon examination, Dr. Baker noted normal shoulder, elbow and wrist joint stability and normal range of motion in both of the plaintiff's upper extremities. (Tr. 580.) Additionally, Dr. Baker noted normal tone and muscle bulk in both upper extremities and normal strength in both extremities. (*Id.*) As is manifest, the record evidence supports the ALJ's determination that Dr. Davis' finding that the plaintiff should be limited to "occasional use of both hands" was unwarranted.

With respect to Dr. Davis' finding that the plaintiff should be limited to 4 hours of walking or standing in an 8 hour work day, the ALJ noted that the record evidence did not support this finding. (Tr. 25.) Upon examination, Dr. Davis noted some musculo-skeletal limitations, finding that the plaintiff's back pain resulted in "slow position changes," "slow squatting" and some reduced range of motion. (Tr. 426.) However, Dr. Davis also noted that the plaintiff had "no other deformity, focal tenderness, nodules, swelling, redness, warmth, atrophy; no clubbing, cyanosis, lymphadenopathy, edema; normal peripheral pulses, venous circulation;

14

normal gait with slow gait maneuvers (heel, toe, & tandem) across exam room without assistance." (Id.) Moreover, there was ample evidence in the record to suggest that the plaintiff's ability to walk and stand was not impaired to the extent suggested by Dr. Davis' decreased walking/standing limitation.

As the ALJ noted, the plaintiff's treatment records from CSJNR "indicate[d] that his treatment worked in controlling his pain" and that his pain levels averaged two out of ten eighty percent of the time." (Tr. 23.) Indeed, at his February 8, 2011, visit to CSJNR, plaintiff reported that he walked for exercise, that he obtained "good relief" using his TENS unit and that 80% of the time his pain was at level 2 out of 10 and the provider noted "[m]uscle stretch reflexes, manual muscle testing, sensation to pinprick for the lower extremities bilaterally were within normal limits." (Tr. 509.) Thereafter, the plaintiff visited CSNJR approximately every two to three months for medication refills. (*See* Tr. 496-507.) Until February 7, 2012, the plaintiff's report and the provider's findings were essentially unchanged.[6] (*See id.*) At his February 7, 2012 and May 29, 2012,[7] visits to CSJNR, the plaintiff reported that 80% of the time his pain was at level 4 out of 10, however, he continued to report that his pain medications and TENS unit were effective in reducing his pain and that he was walking for exercise at least three times per week. (Tr. 530.) Notably, the CSJNR provider's findings were essentially unchanged. (*Id.*)

On August 29, 2012, the plaintiff saw Dr. Baker at TPMPM. Dr. Baker noted normal range of motion at the plaintiff's cervical spine and thoracic spin, reduced range of motion at the

---

[6] At his August 23, 2011, appointment, the plaintiff claimed that "when he stands up for over an hour his legs burn," (Tr. 500), however this was the only visit in which he reported that issue.

[7] As the ALJ noted, at this appointment, the plaintiff was informed that he had tested positive for oxycodone and oxymorphone, two scheduled drugs which CSJNR did not prescribe for him. (Tr. 23.) The plaintiff was informed that he was being placed on "zero tolerance," that he would have a urine drug screen at his next office visit and that he would have to come to the clinic for a pill count on June 12, 2012. (Tr. 531.) There do not appear to be any additional records for CSJNR after the May 20, 2012, appointment.

15

lumbosacral spine; "flexion to mid-shin, extension of 20 degrees," however, the lumbosacral spine had normal muscle strength and tone. (Tr. 580.) Additionally, the plaintiff's straight leg raise test result was negative bilaterally. (*Id.*) The joint stability in plaintiff's right and left lower extremities was "within normal limits" and the plaintiff had "full hip and knee" range of motion. (*Id.*) Finally, Dr. Baker noted normal strength and motor function in the plaintiff's right and left lower extremities with "hip flexion 5/5, knee extension 5/5, doriflexion 5/5, [and] toe extension 5/5." (*Id.*) The ALJ noted in her decision that, when the plaintiff saw Dr. Baker again on September 27, 2012, the plaintiff reported that his pain was "adequately controlled" and that his "treatments have provided improved activity level." (Tr. 23, 556.) Dr. Baker's findings during his physical examination of the plaintiff were essentially unchanged. (Tr. 557.)

Looking at the record as a whole, there was ample evidence to support the ALJ's decision to give little weight to Dr. Davis' opinion because, to the extent that it was inconsistent with the RFC assessment, it was not supported by the objective medical evidence. Moreover, the ALJ adequately explained her reasoning for giving Dr. Davis' opinion less weight than Dr. Bittinger's opinion.

With respect to the ALJ's decision to give little weight to Dr. Lambert's opinions, the ALJ noted that in her March, 2011, report Dr. Lambert opined "that the claimant has marked impairments in understanding and remembering short work-like procedures."[8] (Tr. 26.) The ALJ gave little weight to Dr. Lambert's opinion because "the marked rating appears to overstate the claimant's limitations since the claimant has done detailed work in the past. Also, the

---

[8] By contrast, "Dr. O'Bryan opined that the claimant has moderate limitations in concentration, persistence and pace" and that the plaintiff "can perform one to three step tasks; can maintain concentration, persistence and pace for two hour periods during the workday; can interact appropriately in the workplace; and can adapt to infrequent changes in work routine." (Tr. 25; *see also* Tr. 476-78.

claimant was able to obtain necessary certification for carrying a firearm and he worked as a welder, which was classified as a skilled job." (*Id.*) Additionally, the ALJ noted that the plaintiff "has not sought treatment for mental health symptoms from a mental health care provider and in February 2012, the [plaintiff] admitted that he only took prescribed anti-depressants for two weeks." (Tr. 21; *see also* Tr. 494.) Moreover, by his August 29, 2012, appointment with Dr. Baker, the plaintiff denied that he had anxiety and was not prescribed, or taking, any antidepressant medication and there is no evidence in the record that he took any psychotropic medication thereafter. (Tr. 579, 581, 557-58.) Further, as the ALJ noted, the plaintiff endorsed an expansive range of symptoms and based on the plaintiff's "symptom report," Dr. Lambert crafted a diagnosis. (Tr. 24-25.) Nevertheless, as the ALJ noted, Dr. Lambert recognized that the following events impacted the plaintiff's diagnoses: (1) lost his job within the past year; (2) moved four times within the past year; (3) step-daughter has a skin rash; (4) no contact with siblings; (5) unable to afford medication; (6) divorced and reunited with wife within the past year; (7) children who live with him fuss with each other. (Tr. 25; 445.)

With respect to the plaintiff's intellectual abilities, the ALJ recognized that Dr. Lambert diagnosed the plaintiff with "intellectual functioning in the mildly retarded range," but the ALJ found that the objective evidence did not fully support Dr. Lambert's opinion. (Tr. 25.) The ALJ noted that the plaintiff's school records indicate that he was diagnosed with a learning disorder and that he received special education services. (*Id.*) The ALJ recognized that that the plaintiff's IQ reflected limitations related to intellectual functioning, however, she found that Dr. Lambert's diagnosis of "mild mental retardation" was inconsistent with the plaintiff's work history which established that after he left high school, the plaintiff was employed as a welder, tow motor drive and an armed security guard. (*Id.*) Additionally, the ALJ found that the

plaintiff's ability to obtain certification to carry a firearm for his job "suggests that he was able to complete the necessary paperwork and any testing required." (*Id.*) The ALJ concluded that the plaintiff's "work history is inconsistent with [a] diagnosis of mild mental retardation and shows the ability to perform more complex work." (*Id.*). Thus, the ALJ gave little weight to Dr. Lambert's opinion. Nevertheless, the ALJ gave the plaintiff "the benefit of the doubt" and her RFC assessment limited the plaintiff to "unskilled work consisting of simple tasks and instructions, and work that requires no more than occasional changes in the workplace and, . . . no work that requires reading or writing." (Tr. 25.)

The ALJ adequately explained her reasons for giving little weight to Dr. Lambert's opinion that the plaintiff demonstrated "marked impairment in understanding and remembering short work-like procedures" and the ALJ's mental RFC assessment was substantially supported by the evidence.

The plaintiff next contends that the ALJ's credibility determination was not supported by substantial evidence. Specifically, the plaintiff argues that the ALJ disregarded his hearing testimony about the difficulties he had in his daily life activities, that the ALJ "discredited [the plaintiff] for maintaining gainful employment," and that the ALJ failed to consider the record evidence demonstrating that the plaintiff's complaints and efforts to obtain treatment with respect to his back and neck pain substantiated his credibility.

Although the ALJ, not the court system, is tasked with evaluating a witness' credibility, credibility findings must be "grounded in the evidence and articulated in the determination or decision." SSR 96-7P, 1996 WL 374186 at *4 (July 2, 1996); *Rogers v. Commissioner,* 486 F.3d 234, 247 (6th Cir. 2007). In addition to the objective evidence, the ALJ should consider the

18

following factors when assessing the credibility of a claimant's statements regarding his symptoms:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7P, 1996 WL 374186 at * 3. Under SSR 96–7p the ALJ is required to "consider" the seven-listed factors, but there is no requirement that the ALJ discuss every factor. *See White v. Commissioner,* 572 F.3d 272, 287 (6th Cir. 2009); *see also Coleman v. Astrue,* No. 2:09–cv–36, 2010 WL 4094299, at * 15 (M.D. Tenn. Oct.18, 2010) (finding that "[t]here is no requirement [ ] that the ALJ expressly discuss each listed factor."); *Roberts v. Astrue,* No. 1:09–cv–1518, 2010 WL 2342492, at * 11 (N.D. Ohio June 9, 2010) (finding that "the ALJ need not analyze all seven factors contained in SSR 96–7p to comply with the regulations"). Nevertheless, the Sixth Circuit recognizes that meaningful appellate review requires more than a blanket assertion by an ALJ that "the claimant is not believable." *Rogers,* 486 F.3d at 248. The *Rogers* court observed that Social Security Ruling 96–7p requires that the ALJ explain his or her credibility determination and that the explanation "must be sufficiently specific to make clear to the individual and to any

19

subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Rogers,* 486 F.3d at 248.

Importantly, however, credibility determinations concerning a claimant's subjective complaints are within the province of the ALJ. *See Gooch v. Secretary of Health & Human Servs.,* 833 F.2d 589, 592 (6th Cir.1987). "Claimants challenging the ALJ's credibility determination face an uphill battle." *Daniels v. Commissioner,* 152 F. App'x 485, 488 (6th Cir. 2005); *see Ritchie v. Commissioner,* 540 F. App'x 508, 511 (6th Cir. 2013) (recognizing that "[w]e have held that an administrative law judge's credibility findings are 'virtually unchallengeable.'") "Upon review, [the Court must] accord to the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [the Court] d[oes] not, of observing a witness's demeanor while testifying." *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 476 (6th Cir. 2003).

The ALJ found that "the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (Tr. 22.) The ALJ based this finding on the nature and extent of the plaintiff's activities of daily living, including caring for his three children and his wife, driving, and paying bills. (Tr. 22.) Additionally, the ALJ noted that the plaintiff engaged in leisure activities including going to the lake and grilling. (Tr. 22-23.) The plaintiff also testified to attending church sometimes with his son and daughter, and swimming "once or twice" with his kids. (Tr. 48-49, 58.) The ALJ noted that the plaintiff told his physician that he walks weekly for exercise. (Tr. 23; *see also* Tr. 530.) The ALJ concluded that the plaintiff's activities of daily

living are not as limited as one would expect given the allegations of disabling pain and limitation. (Tr. 23.)

The ALJ also found that the plaintiff's credibility was undermined by his admission that he left his last job because of downsizing, and not because of a medical impairment. (Tr. 23.) Additionally, the plaintiff testified that if he had not been let go he would have tried to stay on the job. (Tr. 46.) He also testified that his unemployment ran out in March, 2012, and that, until it ran out, he looked for work, as required by the state as a condition of receiving unemployment. (Tr. 60.)

The plaintiff argues that in making her credibility finding, the ALJ failed to properly consider the impact of the plaintiff's fall and injury on June 30, 2010, which, the plaintiff alleges, was the event that motivated the plaintiff to seek disability, and the ALJ failed to properly evaluate the plaintiff's on-going treatment for back and neck pain. The ALJ fully considered the impact of the plaintiff's June 30, 2010, fall stating: "In June 2010, about the time of the alleged onset date, the claimant reported that his pain was the same. At the time of his fall in 2010, the claimant's range of motion in his neck and back was within normal limits and he had no trouble walking." (Tr. 23; *see also* Tr. 339.) Additionally, evidence in the record established that shortly before his fall on June 30, 2010, the plaintiff complained during a visit to CSJNR that his pain was at level 2 out of 10 for 80% of the day and he was taking Lortab 10/500 not to exceed 5 per day, along with Trazodone HCL an antidepressant. (Tr. 339.) The records from the emergency room visit after the fall note that the plaintiff complained of "moderate pain," that he suffered a mild wedge compression fracture of L1," but his thoracic spine was normal and no other impairments were noted. (Tr. 377-78.) The plaintiff was instructed to "[a]pply ice intermittently," he was prescribed Vicodin 5 mg, 15 pills were dispensed, and Flexeril 10 mg, 20

pills were dispensed, refills were not authorized for either medication, and he was instructed to take over the counter Motrin. (Tr. 378.) He was discharged in "good" condition. (*Id.*) His records from visits to CSJNR in 2010, indicate that the plaintiff may have suffered on-going pain from his June 30, 2010 fall, (Tr. 337, 514), however by February 8, 2011, the plaintiff was reporting average pain of 2 out of 10 for 80% of the day, that his TENS unit was providing "good relief," his current medications were working to "lessen his pain" and that he was walking for exercise. (Tr. 509.)

With regard to the plaintiff's on-going treatment for back and neck pain, the ALJ found that "[w]ith regard to the alleged limitations from back and neck pain, the medical record does not support disabling limitations from pain." (Tr. 23.) In support of this finding the ALJ noted that the plaintiff repeatedly reported that his pain was "adequately controlled" and that his medications and TENS unit were "effective in reducing his pain." (Tr. 24.) Additionally, she noted that "[t]he most recent records from the pain clinic, on September 26, 2012, show that the claimant admitted to his treatment provider that his pain was controlled." (*Id.*)

Based on the foregoing, it is clear that the ALJ sufficiently explained the reasoning behind her credibility determination

Finally, as his last claim of error, the plaintiff argues that the ALJ erred at Step 5 of the sequential evaluation process by relying on the Vocational Expert's testimony that there were jobs that existed in significant numbers in the national economy that the plaintiff could have performed. In making this argument, the plaintiff reasons that because the ALJ erred in evaluating the plaintiff's RFC and credibility, her hypothetical question(s) to the Vocational Expert were, necessarily, incomplete because they did not take into account all of the plaintiff's limitations. Because the court finds that the ALJ's RFC assessment and credibility determination

are substantially supported by the evidence, she did not err in asking the Vocational Expert hypothetical questions based on the limitations she found credible. *See Spicer v. Comm'r of Soc. Sec.*, 651 F. App'x 491, 494 (6th Cir. 2016) (citing *Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

Even so, the hypothetical questions to which the Vocational Expert responded incorporated not just the limitations the ALJ found credible, but all manner of limitations. The ALJ posed hypothetical questions to the Vocational Expert that incorporated all the limitations raised by Drs. Davis, Bittinger, O'Bryan and Lambert. (Tr. 63-68.) The plaintiff's counsel also posed hypothetical questions to the Vocational Expert regarding additional limitations about which the plaintiff testified at the hearing. (*Id.*) Consequently, the ALJ's questioning of the Vocational Expert was complete and she was entitled to rely on the Vocational Expert's answers to hypothetical questions to prove the existence of a significant number of jobs in the national economy that the plaintiff could perform.

In sum, the plaintiff's allegations of error have no merit, and the decision of the ALJ is supported by substantial evidence on the record as a whole. Therefore, the ALJ's decision will be affirmed.

## VI. Conclusion

In light of the foregoing, the plaintiff's Motion for Judgment on the Administrative Record will be DENIED and the decision of the SSA will be AFFIRMED. An appropriate order is filed herewith.

THOMAS A. WISEMAN, JR.
SENIOR DISTRICT JUDGE

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

MARTY LEE McKAY,          )
                                       )
       Plaintiff,        )
                                       )
         v.          )   No.  3:14-cv-1296
                                       )   Judge Thomas A. Wiseman, Jr.
SOCIAL SECURITY      )
ADMINISTRATION,      )
                                       )
       Defendant.

## ORDER

For the reasons set forth in the accompanying Memorandum Opinion, the court
**VACATES** the referral to the magistrate judge. The plaintiff's Motion for Judgment on the
Administrative Record (ECF No. 15) is **DENIED** and the decision of the Social Security
Administration is **AFFIRMED**.

This case is **DIMISSED** and the Clerk is directed to **CLOSE** the file. This Order shall
constitute the final judgment in this case pursuant to Fed. R. Civ. P. 58.


THOMAS A. WISEMAN, Jr.
SENIOR DISTRICT JUDGE